# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| CHERYL M. STINECIPHER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case number 4:09cv0947 HEA |
| | ) | TCM |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security ("Commissioner"), denying the application of Cheryl M. Stinecipher ("Plaintiff") for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. § 401-433. Plaintiff has filed a brief in support of her complaint; the Commissioner has filed a brief in support of his answer. The case was referred to the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

## Procedural History

Plaintiff applied for DIB in July 2006, alleging she was disabled as of May 22, 2005, by depression, a loss of movement in her right side, and pain in her lower back, neck, hip, and shoulder. (R.[1] at 109-11.) Her application was denied after an administrative review and

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

again after a hearing in August 2008 before Administrative Law Judge ("ALJ") Michael D. Mance.[2] (Id. at 16-60, 75, 84-88.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Jeffrey F. Magrowski, Ph.D., testified at the administrative hearing.

Plaintiff is married and lives with her husband and two children, one is fifteen years old and the other is ten years. (Id. at 35-36.) She takes care of the children when her husband is working. (Id. at 38.) She graduated from high school but was in special education until the eleventh grade. (Id. at 35.) She was in regular classes in the eleventh and twelfth grades, but still needed help. (Id.)

Plaintiff was recently diagnosed with diabetes. (Id. at 36.) Medication, Metformin, is supposed to keep the diabetes under control but it does not. (Id.) She has had problems with her lower back for more than ten years. (Id. at 37.) She has degenerative disc disease in her lumbar spine that causes a stabbing, burning feeling twice a week. (Id.) Alternating heating pads and cold packs used to relieve the pain but no longer does. (Id.) She has been

---

[2]A prior application for DIB was denied in 1996. (Id. at 125.) Following an administrative hearing, an October 2001 application was denied on the grounds that Plaintiff had the residual functional capacity to perform her past relevant work as a cashier or deli cutter-slicer. (Id. at 64-69.) A 2005 application alleging a disability since May 2000 was denied initially on April 14, 2005, and again in May 2006 after Plaintiff failed to appear at the requested administrative hearing. (Id. at 19, 73-74.) A request to reopen the action was denied. (Id. at 19.)

taking pain medication and Tylenol P.M. (Id. at 38.) Neither helps much. (Id.) She had fusion surgery on her back in 1994. (Id. at 38-39.) After the surgery, her doctors told her parents that her back was deteriorating too quickly for them to do any more operations. (Id. at 39.)

Plaintiff also has had three surgeries on one shoulder and two on the other. (Id.) Her shoulders constantly hurt. (Id. at 39, 41.) She has had physical therapy for her shoulders, but it did not help. (Id. at 42.) She cannot lift heavy objects. (Id. at 39.) The heaviest object she can lift is a two-gallon milk container. (Id. at 40.) Her capacity to stand or sit has deteriorated during the past two years to the point where the longest she can do either is for five to ten minutes. (Id. at 40, 49-50.) Two years ago, she could sit for almost an hour and stand for two hours. (Id. at 51.) Thirty minutes is the longest she can walk without having to sit. (Id. at 40.)

Asked how she is mentally, Plaintiff replied that she is a "nervous wreck." (Id. at 41.) She worries about everything, including putting food on the table and her children and husband having to do all the housework. (Id.) She tries to do the dishes, but has to sit down after a few minutes. (Id.) She helps fold the laundry and only cooks for approximately five minutes before her daughter has to take over. (Id. at 41-42.) She can dress herself but usually has to have someone help her in and out of the bathtub. (Id. at 43.) She takes Zoloft for her nerves. (Id. at 42-43.)

She does not have any side effects from her medications; they simply do not help.  (<u>Id.</u> at 43.)  She takes Hydrocodone and, as needed, Oxycodone.  (<u>Id.</u> at 49.)  Her treating physicians are Dr. Thanawalla and Dr. Hulsey.  (<u>Id.</u> at 48, 50.)

Also, Plaintiff falls asleep during the day for four to five hours.  (<u>Id.</u> at 51-52.)  She gets headaches two to three times a day.  (<u>Id.</u> at 52.)  These headaches can last for three or four days.  (<u>Id.</u> at 53.)  She takes Tylenol P.M. and sleeps for relief.  (<u>Id.</u>)  Sometimes, nothing helps.  (<u>Id.</u>)

Plaintiff last had any significant income in 1997 and 1998.  (<u>Id.</u> at 45.)

Plaintiff does not engage in any activities.  (<u>Id.</u> at 46.)  She seldom goes out and has to lie down with a heating pad on her back after she does.  (<u>Id.</u>)  Because of the pain in her back and legs, she falls two or three times a week.  (<u>Id.</u>)  This has happened since 1994, but has been worse in the past seven years.  (<u>Id.</u> at 47.)

Asked what had happened after the amended onset date of May 1, 2001, Plaintiff said she could not remember.  (<u>Id.</u>)  Asked what had happened on the original onset date of May 22, 2005, she could not remember.  (<u>Id.</u>)  Reminded about a car accident in 2001, Plaintiff confirmed that she had then re-injured her back.  (<u>Id.</u>)

Dr. Magrowski testified as a vocational expert ("VE").  He classified Plaintiff's cashier work in the shoe department at Wal-Mart as medium, unskilled work as she had performed it and as light work as it could be performed.  (<u>Id.</u> at 55.)  The nurse's aide work she had

performed was at a low, semiskilled level[3] and was heavy to very heavy.  (Id.)  Her jobs as

a meat cutter at a delicatessen were light, unskilled.  (Id.)

The ALJ then asked the VE the following question.

Assume an individual who is limited to performing . . . light exertional level work, . . . which would allow the individual to rotate positions frequently.  The individual would be limited to occasionally climbing stairs and ramps, never climbing ropes, ladders, scaffolds, occasionally balancing, stooping, kneeling, crouching and crawling.  Occasional reaching in all directions including overhead.  The individual must work in a temperature controlled environment and the individual should have no concentrated exposure to unprotected heights or exposure to dangerous machinery.  First of all, could that individual perform any of the claimant's past work?

(Id. at 55-56.)  The VE replied in the negative.  (Id. at 56.)  Such individual could, however,

perform a job such as an information clerk, 237.367.018 in the Dictionary of Occupational

Titles ("DOT"), which was light and unskilled work, and some jobs as a surveillance system

monitor, DOT 379.367-010, which would be sedentary, unskilled work, or as a furniture

rental consultant, DOT 295.357-018.  (Id.)  These three jobs existed in significant numbers

in the state and national economies.  (Id.)  If this individual was also limited to sedentary

exertional level work, she could perform work as a call-out operator, DOT 237.367.014, a

job existing in significant numbers in the state and national economies.  (Id. at 56-57.)

If the hypothetical individual must also be accommodated to allow for occasional

unscheduled disruptions, there were no jobs that such individual could perform.  (Id. at 57.)

---

[3]Plaintiff was not a certified nurse's aide.

Plaintiff's counsel asked the VE if an individual of the same age[4] and with the same education, and experience as Plaintiff who also needed to lie down or take a nap during a normal eight-hour work day could perform any of Plaintiff's past relevant work or other work in the national or local economies.  (Id.)  The VE replied that if such individual could lie down during normal breaks or the lunch hour, there might be work this individual could perform "but most likely not."  (Id. at 57-58.)  If the individual had to take more than the three breaks during the normal eight-hour day, it was likely that person would be fired.  (Id. at 58.)  Asked if the information he provided conformed to that in the DOT for the cited jobs "other than the rotate positions aspect," the VE replied in the affirmative.  (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to her application, records from health care providers, and assessments by an examining consultant and by a treating physician.

When applying for DIB, Plaintiff completed a Disability Report.  (Id. at 128-37.)  She listed her height as 5 feet 1 inch tall and her weight as 190 pounds.  (Id. at 128.)  Her impairments prevent her from standing too long.  (Id. at 129.)  She hurts if she goes to work and then cannot work the next day.  (Id.)  Her impairments first bothered her in 1994 and stopped her from working as of May 22, 2005.  (Id.)  She had tried working after her impairments first bothered her.  (Id.)  She had worked in the shoe department and had been

---

[4]Plaintiff was born on December 15, 1968, id. at 124, and would have been 47 years old at the time of the hearing.

moved to the jewelry department because she could not lift heavy boxes.  (Id.)  She could not

work in the jewelry department because she could not stand for long.  (Id.)  She had stopped

working on February 1, 2000, when she was sick, could not get out of bed to go to work, and

had been fired.  (Id.)  Plaintiff had worked as a nurse's aide from 1989 to 1996, as a cashier

from 1994 to 1999, and as a food service worker from 1999 to 2000.  (Id. at 130.)  She had

seen Kirk E. Brockman, M.D., for her back from 1992 to 2005 [5] and currently saw Shaukat

Thanawalla, M.D.  (Id. at 131, 133.)  She had been placed in special education classes when

she was in the third grade.  (Id. at 136.)

Plaintiff also completed a Function Report.  (Id. at 152-59.)  Asked to describe what

she does from waking to going to bed at night, Plaintiff replied that she first tries to help her

children get dressed for school, but they end up helping her get back into bed.  (Id. at 152.)

On some days, she stays in bed all day.  (Id.)  On other days, she takes her children to school

and then goes back to bed.  (Id.)  Asked if she takes care of anyone, she replied that she cooks

for her husband and children and gets them up and off to work or school.  (Id. at 153.)  She

yells at them a lot.  (Id.)  Her daughter tries to keep the house clean and cook dinner.  (Id. at

153, 154.)  She only prepares meals when her daughter is not at home, and then it takes at

least one hour.  (Id. at 154.)  She only does household chores if her daughter is not at home,

and then it takes hours.  (Id.)  She needs help to pick up or lift things.  (Id.)  Both her children

take care of the dog.  (Id. at 153.)  Before her injuries, she could play, take care of her

_____

[5]A request to Dr. Brockman for his medical records from May 2005 to the present was
returned with a notation that Plaintiff's last office visit was in April 2004.  (Id. at 149.)

children, and keep the house clean. (Id.) Her impairments keep her up. (Id.) Her daughter and husband help her dress and bathe. (Id.) Her daughter helps her with her hair. (Id.) She needs to be reminded to go somewhere and to take her medicine. (Id.) She does not do any house work or yard work because it causes too much pain. (Id. at 155.) She leaves the house only to go somewhere. (Id.) She goes shopping once a week for food or children's clothing or birthdays. (Id.) Her hobbies include watching television and watching her children play soccer. (Id. at 156.) When she does these, she hurts. (Id.) She cannot sit or stand for long and has to lie down to watch television. (Id.) She talks to family on the phone and on the computer. (Id.) Her impairments affect her abilities to lift, stand, reach, walk, sit, kneel, climb stairs, remember, complete tasks, concentrate, understand, follow instructions, use her hands, and get along with others. (Id. at 157.) She can not walk longer than twenty to thirty minutes before having to rest for ten minutes. (Id.) Lifting anything heavier than fifteen pounds or standing, sitting, or walking too long causes pain. (Id.) She cannot pay attention for long and has to have her daughter's help reading instructions. (Id.) She does not handle stress or changes in routine well, but she gets along okay with authority figures. (Id. at 158.) She needs to use a cane when she is in a lot of pain. (Id.)

After her application was denied, Plaintiff completed another Disability Report. (Id. at 171-75.) She did not have any new illnesses, injuries, or conditions and had not seen any doctor for any condition, including emotional or mental ones, since completing the earlier report. (Id. at 172.) On a separate form, she listed her current medications: Zoloft for

anxiety, Metformin for diabetes, Hydrocodone, and Oxycodone. (Id. at 176.) The last two were for pain and were to be taken as needed. (Id.)

In the twelve years between 1989 and 2000, inclusive, Plaintiff's annual earnings exceeded $10,000 three times, in 1994, 1997, and 1998. (Id. at 116.) Her highest earnings, $11,158.70, were in 1997. (Id.) Her annual earnings in 1999 and 2000 did not exceed $3,000 either year. (Id.) She had worked for three quarters in 2000 and had no reportable earnings after that year. (Id. at 118.)

The relevant medical records before the ALJ are summarized below in chronological order.

The earliest record is that of an office visit to Dr. Brockman on October 30, 2001. Plaintiff reported that she was continuing to have to take pain pills at night. (Id. at 179.) A pelvic ultrasound was normal. (Id. at 201.)

Plaintiff next saw Dr. Brockman on May 6, 2002, about episodes of dizziness for the past two weeks. (Id. at 180, 198-200.) She also had a lesion on her right wrist, nausea, coughing followed by vomiting, and nasal congestion. (Id. at 180.) Blood tests were within normal limits. (Id. at 198-99.) The best measurement of her forced vital capacity (FCV) on a pulmonary function test was 104% of the norm and of her forced expiratory volume (FEV) was 100% of the norm. (Id. at 200.)

Plaintiff returned one week later after being in a car accident and experiencing back and neck pain. (Id.) Her car had been rear-ended by another car. (Id.) She was diagnosed

with cervical and lumbar sprain, given a script for physical therapy for three weeks, and told to use ice packs.  (Id.)

Plaintiff consulted Dr. Brockman again on June 18.  (Id. at 186.)  Her back pain was better; she had good days and bad days.  (Id.)  Her neck pain was also better.  (Id.)  She was doing exercises and using heat to relieve the pain; she was not taking any medication.  (Id.)  He diagnosed Plaintiff with cervical and lumbar strain, prescribed Naprosyn, a nonsteroidal anti-inflammatory drug, gave her a home exercise program, and advised her to return if her pain did not improve.  (Id.)  Plaintiff did return, on July 9.  (Id.)  The neck pain was still there and was aggravated by the exercises.  (Id.)  The Naprosyn was renewed and three weeks of physical therapy was prescribed.  (Id.)

When Plaintiff returned to Dr. Brockman on August 23, she reported that for the past month she had had pain in the right upper quadrant of her chest.  (Id. at 185.)  She also had a mildly restricted range of motion in her left shoulder.  (Id.)  She was prescribed Flexeril, a muscle relaxant, and Voltaren, a nonsteroidal anti-inflammatory drug, and was to have a functional capacity evaluation.  (Id.)

When Plaintiff next saw Dr. Brockman on October 29, she continued to complain of low back pain and wanted a magnetic resonance imaging (MRI) scan of her back and referral to a specialist.  (Id.)  She was given both and a prescription for Valium, an anti-anxiety medicine.  (Id.)  The MRI showed (1) a disc bulge and facet joint hypertrophy at L4-L5 resulting in a narrowing of the spinal canal, and (2) postoperative changes at L5-S1, unchanged from January 1996.  (Id. at 196-97.)  The MRI did not show a recurrent disc

protrusion. (Id.) X-rays taken on November 18 revealed degenerative endplate sclerosis and disc space narrowing at L5-S1. (Id. at 177.) There was no compression deformity, destructive lesion, spondylosis, or abnormal motion. (Id.)

Plaintiff consulted Dr. Brockman on January 30, 2003, about mid-sternal pain. (Id. at 184.) She was to have a bone scan of her right ribs and was prescribed Prednisone. (Id.) The scan revealed "[m]ildly increased activity extending across the upper edge of the manubrium sterni, across the sternomanubrial joint and along the junctions of the individual segments of the body of the sternum." (Id. at 195.) This activity could be normal. (Id.) One week later, she reported that the Prednisone was helping. (Id. at 184.) An upper gastrointestinal study revealed gastroesophageal reflux disease (GERD) and a hiatal hernia. (Id. at 183, 194.) Plaintiff was prescribed medication and was to return in six weeks. (Id. at 183.) If she was not then better, surgery would be considered. (Id.)

Plaintiff forgot her next, April 1 appointment with Dr. Brockman, but returned the following month with complaints of a sore throat and low grade fever for the past three months. (Id. at 183.) In July, Plaintiff consulted Dr. Brockman about a possible spider bite. (Id.) She was given a cream to apply for two weeks. (Id.)

Plaintiff did not show for her next appointment, but did return one week later, on August 6, about a lesion on her left arm and daily headaches. (Id. at 182.)

On October 1, Plaintiff saw Dr. Brockman about pain in her left arm for the past month. (Id.) An MRI of her arm revealed a rotator cuff injury. (Id. at 181, 193.) Plaintiff

- 11 -

was prescribed Celebrex and was to participate in physical therapy for three weeks three times a week.  (Id. at 181.)

On a form Plaintiff completed when she first saw Richard E. Hulsey, M.D., on November 21, she indicated that the pain in her left shoulder had increased over the past several months, she was numb from her shoulder to her hand and had trouble dressing, and she had popping and grinding in that shoulder.  (Id. at 310-11.)  In a section for her medical history, she marked that her history included low back pain, but did not mark diabetes or depression.  (Id. at 311.)  Another portion of the form requested that Plaintiff check any of the eighteen listed conditions she was currently experiencing, including, inter alia, frequent headaches.  (Id.)  She did not circle any.  (Id.)  She reported to Dr. Hulsey that her right shoulder was doing fairly well after a repair "many years ago," but her left shoulder was painful and had become increasingly so over the past two years. (Id. at 297-98.)  Therapy had increased the pain.  (Id. at 298.)  Her medical history was unremarkable with the exception of low back pain.  (Id.)  On examination, she had a normal range of motion in her left shoulder, but had some pain on overhead movement.  (Id.)  Rotation, both internal and external, was normal.  (Id.)  She had some popping in her shoulder and "some fairly marked pain with stressing the supraspinatus space."  (Id.)  Dr. Hulsey's impression was of impingement syndrome with possible partial rotator cuff tear.  (Id.)  He noted that the MRI was "somewhat unusual for the area of irritation."  (Id.)  He recommended an arthroscopic evaluation and decompression, with repair of a tear if necessary.  (Id.)

Subsequently, Plaintiff underwent an arthroscopy of her left shoulder with subacromial decompression on December 17. (Id. at 298-99, 322-23.) Dr. Hulsey's notes refer to a previous arthroscopic decompression on the right shoulder. (Id. at 322.) Five days later, Plaintiff had no complaints of pain and was doing very well. (Id. at 299.) She was to participate in therapy three times a week for three weeks for range of motion and return in one month. (Id.)

Plaintiff cancelled her next two appointments with Dr. Hulsey. (Id.) She saw him again on February 23, 2004. (Id. at 299-300.) At that time, she had "only one little area around the lateral portal that [was] somewhat painful" and had "progressed well in physical therapy." (Id. at 299.) She had "essentially a full range of motion," only mild pain with impingement, and "excellent strength of the rotator cuff." (Id.) She was to continue her home exercise program and return as needed. (Id. at 300.)

Plaintiff next saw Dr. Brockman on April 2 about lower back pain for the past few days and numbness in both arms. (Id. at 181.) A bilateral peroneal and tibial nerve conduction study was normal, as was a right ulnar nerve conduction study. (Id. at 187-91.) A left ulnar nerve conduction study was inconclusive as to whether there was a left ulnar neuropathy. (Id. at 191.) Correlative clinical findings, if they existed, would indicate a very mild right median neuropathy. (Id.) Plaintiff's prescription for Celebrex was renewed. (Id. at 181.)

Plaintiff consulted Dr. Thanawalla on March 31, 2005, about low back since 1994 and neck pain since 2001. (Id. at 213-14, 225-26, 236-37, 272-73, 295-96.[6]) The former was a dull aching pain that caused her to be unable to get out of bed. (Id. at 214.) The latter was also a dull aching pain and was sometimes accompanied by headaches. (Id.) On examination, she was tender in her middle back. (Id.) Flexion and extension were painful. (Id.) Plaintiff was prescribed Flexeril and Ultracet, a pain reliever, and was to apply moist heat. (Id. at 213.) X-rays of her lumbar spine showed degenerative disc narrowing at L5-S1 and L4-L5. (Id. at 225, 249.) X-rays of her cervical spine were within normal limits. (Id. at 226, 250.)

When Plaintiff again saw Dr. Thanawalla, on May 13, she reported that she had been having right knee pain for the past week after walking around the zoo all day. (Id. at 212, 224, 235, 271.) The knee was tender; flexion and extension were painful. (Id. at 212.) An x-ray did not reveal any evidence of fracture or acute injury. (Id. at 224, 248, 294.) She was to apply ice to the knee, rest, use a knee brace, take Naprosyn, and return in a week if no better. (Id. at 212.) She was also to avoid salt and caffeine and to drink more water. (Id.) When Plaintiff next contacted Dr. Thanawalla, on July 14, it was to request a diabetes screening based on a history of gestational diabetes mellitus. (Id.) She was instructed to make an appointment for an annual examination. (Id.)

---

[6]Portions of Dr. Thanawalla's records were submitted three times, the most recent submission including the most recent records. Citations to the pages of each appearance will only be included in the first reference to the particular visit.

Plaintiff was to see Dr. Hulsey on July 25 but did not keep the appointment. (Id. at 300.)

On August 9, Plaintiff consulted another physician in Dr. Thanawalla's practice, Theresa Halsted, M.D., about her fluctuating blood sugar levels. (Id. at 211, 234, 270.) And, she had abdominal and right upper quadrant pain. (Id.) A computed topography (CT) scan of her abdomen and pelvis and an ultrasound of her abdomen, including her gallbladder, right kidney, and pancreas, were both negative. (Id. at 210, 222-23, 246-47, 292-93.) She was also to have a glucose tolerance test. (Id. at 211.) The test was performed on August 15 and indicated a high amount of glucose. (Id. at 220, 244, 286.)

Plaintiff saw Dr. Thanawalla on August 18. (Id. at 210, 233, 269.) She described her right upper quadrant pain as existing for one year and becoming worse during the past month. (Id.) The pain was less when she lay down. She also had low back pain for the past ten days and a history of a herniated disc and pinched nerve. (Id.) She was to continue with her medication and was to watch her diet. (Id.) A week later, Plaintiff was notified that the CT scan and ultrasound were both negative. (Id.)

Plaintiff called Dr. Thanawalla's office on September 20 to request medicine for neck and back pain. (Id. at 209, 232, 268.) She explained that she could not come into the office. (Id.) A prescription for Naprosyn and for Norflex, a muscle relaxant, was telephoned to her pharmacy. (Id.) She was told she would need to be seen if she did not improve on the medication. (Id.)

Plaintiff next saw Dr. Thanawalla on January 12, 2006, for right shoulder pain and loss of range of motion for the past two months. (Id. at 209, 221, 232, 245, 268-69, 291.) She was unable to hold a gallon of milk. (Id. at 209.) She had had a rotator cuff tear surgically repaired in 1997. (Id.) The shoulder was to be x-rayed; steroid injections were given; and Naprosyn was prescribed. (Id. at 208-09, 231.) If she did not improve in two to four weeks, she was to have an MRI of the shoulder. (Id. at 209.) An x-ray was normal. (Id. at 221, 245, 291.)

Blood tests taken on April 1 indicated an abnormal insulin level; the level was 18, which was 1 point greater than the high end of the normal range. (Id. at 281-83.)

Plaintiff returned to Dr. Thanawalla on April 21 with complaints of a stuffy head, coughing, vomiting, a runny nose, and occasional incontinence caused by the coughing.[7] (Id. at 207, 230, 266.) She was diagnosed with an upper respiratory infection. (Id.) It was also noted that she had impaired glucose tolerance; she was to have her blood sugar levels checked in three weeks. (Id.)

Plaintiff consulted Dr. Thanawalla on July 12 about her nerves. (Id. at 229, 265.) Specifically, she was angry, depressed, biting her nails, yelling at her children, and having crying spells. (Id.) She was diagnosed with anxiety and depression and was prescribed Zoloft, an anti-depressant. (Id.) It was again noted that she had impaired glucose tolerance. (Id.) A script was written for an "Accu Check" device to check her blood sugar levels. (Id.)

---

[7]Plaintiff had seen Dr. Thanawalla between the January and April visits for a cough, sinus drainage, dizziness and an ear infection, but the date of this visit is not listed. (Id. at 208.)

The prescription for Zoloft was refilled when Plaintiff next saw Dr. Thanawalla. (Id. at 228, 264.) She reported that she was doing fine. (Id.) Blood tests indicated that her level of glycosylated hemoglobin,[8] HbA1s, was 6.1%; 6.0% was the high end of normal range. (Id. at 280.) She was advised to watch her sugar. (Id.)

Plaintiff returned to Dr. Thanawalla on October 6 with complaints of a sudden onset of right shoulder pain. (Id. at 263.) The pain was sharp and fluctuated. (Id.) It was worse with lifting and was accompanied by low back pain. (Id.) Flexion and extension were painful. (Id.) Plaintiff was prescribed Ultracet and Naprosyn and was told to rest, apply ice, and follow-up with Dr. Hulsey. (Id.)

Plaintiff did so, on October 18. (Id. at 300-01, 312-13.) On a form, Plaintiff noted that the recent problems with her right should began two to three months ago. (Id. at 312.) She marked that her medical history included low back pain, diabetes, and depression. (Id. at 313.) For work status, she marked "Homemaker," but did not mark "Disabled" or "Unemployed." (Id.) The symptoms she was currently experiencing included pain, depression, weakness, arthritis, and numbness. (Id.) On examination, the range of motion in her right shoulder was limited to about 160E and to 70E on external rotation. (Id. at 300.) An MRI of the right shoulder revealed tearing of the supraspinatus and infraspinatuas tendon, advanced tendinosis, and a large amount of fluid in the subacromial subdeltoid bursa. (Id.

---

[8]The amount of glycosylated hemoglobin in a patient with diabetes mellitus is indicative of the patient's glucose control. See Stedman's Medical Dictionary, 778-79 (26th ed. 1995).

at 324.)  It was noted that these findings were significantly increased from those in an August 1999 MRI.  (Id.)

When Plaintiff met with Dr. Hulsey again the following week, he noted that there was no atrophy about the shoulder and "near normal, though uncomfortable" internal and external strength."  (Id. at 301.)  It was decided to proceed with an arthroscopic evaluation with possible debridement and repair.  (Id.)  Consequently, on November 29, Dr. Hulsey performed an arthroscopy of Plaintiff's right shoulder with superior labral repair, subacromial depression, and excision of the distal clavicle.  (Id. at 301-02, 316-17.)

At a follow-up visit two weeks later, Plaintiff reported that she was improving but having difficulty sleeping at night.  (Id. at 302.)  She was to keep her shoulder in a sling for another two weeks and then start physical therapy.  (Id.)

Dr. Hulsey informed Plaintiff that the sling could be discontinued when he saw her on January 12, 2007.  (Id. at 302-03.)  She had been using the sling intermittently and was described as making adequate progress and still experiencing some discomfort.  (Id. at 302.)  She was to return in six weeks, but returned in one after tripping on a wire and falling.  (Id. at 303.)  On examination, there was some mild tenderness but no bruising.  (Id.)  Active assisted elevation was to 130E with discomfort.  (Id.)  External rotation was to 40E.  (Id.)  She had reasonable strength.  (Id.)  Dr. Hulsey was concerned that Plaintiff disrupted the repair, but noted that it was too early to tell and prescribed Plaintiff a Medrol dosepack and Naprosyn.  (Id.)  She was to return in two weeks.  (Id.)

Plaintiff did return, reporting that the Medrol dose pack gave her partial relief and that a simple task such as folding clothes caused pain in her shoulder. (Id. at 303-04.) She had difficulty elevating the arm. (Id. at 303.) An MRI was to be done to evaluate the labrum and rotator cuff. (Id. at 304.) The MRI revealed an increased signal in the rotator cuff tendon. (Id. at 326.) A full thickness tear was ruled out, but a partial tear was not. (Id.) When meeting with Dr. Hulsey about the MRI results, Plaintiff reported that she was "feeling somewhat better" but was still "very limited" in what she could do. (Id. at 304.) The decision was for Plaintiff to continue home exercises for the next four to six weeks and then reevaluate. (Id.)

Plaintiff saw Dr. Thanawalla on February 20 for a follow-up appointment. (Id. at 262, 279.) Although she was reportedly doing fine, she complained of noises while sleeping, shaking legs, headaches, and daytime sleepiness. (Id. at 262.) Blood tests indicated a 6.2% level of HbA1s. (Id. at 279.) Plaintiff was told to follow a low carbohydrate diet and to exercise; the tests would be repeated in six months. (Id.)

On July 30, Plaintiff consulted Dr. Thanawalla about a dry cough followed by vomiting and pain in her left ribs. (Id. at 261.) She was diagnosed with an upper respiratory infection; prescribed Allegra, cough syrup, and a course of steroids; and was told to follow-up in two to three days if not better. (Id.) She followed up two weeks, reporting that she was still coughing. (Id. at 260.) She was diagnosed with acute bronchitis and told to continue the Allegra, prescribed Levaquin, told to start a Medrol dose pack if no better in two days, and

was given Albuterol.  (Id.)  Four days later, she started the Medrol.  (Id.)  Five days later, she was scheduled for an x-ray.  (Id.)

When Plaintiff saw Dr. Thanawalla on September 6 she still had a cough and also had sinus headaches and drainage.  (Id. at 259, 290.)  She was diagnosed with seasonal allergies and was to restart the Medrol dose pack, in addition to taking the Allegra.  (Id. at 259.)  A chest ray showed no evidence of acute cardiopulmonary disease.  (Id. at 290.)

Having last seen Dr. Hulsey in February, Plaintiff returned to him on December 3. (Id. at 304-05, 314-15.)  She was continuing to have pain in her right shoulder and had recently developed pain in her left shoulder.  (Id. at 304.)  She had a full range of motion, with discomfort, in her right shoulder, and pain when stressing the supraspinatus and infraspinatus muscles.  (Id. at 305.)  On a form, Plaintiff marked that her medical history included low back pain, but did not mark diabetes or depression.  (Id. at 314-15.)  For work status, she marked "Homemaker," but did not mark "Disabled" or "Unemployed."  (Id. at 315.)  Another portion of the form requested that Plaintiff circle any of the fifty-one listed conditions she was currently experiencing, including, inter alia, pain and depression.  (Id.) She did not circle any.  (Id.)  Because Plaintiff's pain had not resolved, the decision was made to proceed with another arthroscopic evaluation.  (Id. at 305.)

Dr. Hulsey performed the evaluation of Plaintiff's right shoulder on December 19 with repair of the superior labrum of the right shoulder and injected a corticosteroid into the left shoulder.  (Id. at 318-19.)

At her follow-up appointment with him, on January 4, 2008, Plaintiff was doing very well and had only mild discomfort. (Id. at 305-06.) She was not taking much pain medication. (Id. at 305.) The injection to her left shoulder had not given her much relief. (Id.) She was to stay in a sling for another two weeks and then do some gentle exercises. (Id. at 305-06.) Her motion was "fairly good," but the strengthening exercises were to wait. (Id. at 306.)

The day before, Plaintiff had seen Dr. Thanawalla for complaints of back pain with left lower quadrant abdominal pain for the past two weeks and a burn on her right ring finger. (Id. at 256-58.) She described the pain as sharp, fluctuating (becoming worse when she coughed), and radiating to her left groin. (Id. at 256, 258.) A CT scan of her abdomen and pelvis was taken to rule out diverticulosis, an ovarian abscess, or a kidney infection; the scan was normal. (Id. at 257, 289.) An ultrasound of her kidneys was also normal. (Id. at 288.)

Plaintiff had a follow-up visit with Dr. Hulsey on February 11. (Id. at 306.) Although she had some mild discomfort, she was described as "doing relatively well" and was "pleased with her pain relief." (Id.) She had been doing her home exercises. (Id.) She was going to start physical therapy one time a week. (Id.) If she was doing well in one month, surgery on her left shoulder would be considered. (Id.)

Blood tests done on February 15 indicated high levels of glucose. (Id. at 275-77.) The next month, on March 10, blood tests indicated that Plaintiff had diabetes mellitus, type II. (Id. at 278.) One week later, she saw Dr. Thanawalla about her diabetes. (Id. at 254-55.) It was noted that Plaintiff had a history of borderline glucose intolerance. (Id. at 254.) Her

past medical history included only one other problem – major depressive disorder.  (Id.)  She was diagnosed with type II, diabetes mellitus, was started on glucophage, placed on a diabetic diet and told to exercise, and referred to a diabetic education office.  (Id.)

On March 14, Plaintiff reported to Dr. Hulsey that her right shoulder was doing well but her left shoulder was increasingly more painful.  (Id. at 306-07.)  She had recently been diagnosed with diabetes.  (Id. at 306.)  An MRI of her left shoulder was to be obtained, and was performed on March 25, revealing degenerative joint changes at the acromioclavicular joint of the left shoulder, a "mass effect on the underlying rotator cuff," and rotator cuff tendinopathy.  (Id. at 307, 328.)

The next month, on April 3, Plaintiff complained to Dr. Thanawalla of low back pain causing her to be unable to walk or get out of bed.  (Id. at 253, 255.)  She was diagnosed with a low back spasm and prescribed Naprosyn and Flexeril.  (Id.)

On May 9, after reviewing with Plaintiff the results of the earlier MRI, Dr. Hulsey performed an arthroscopy of Plaintiff's left shoulder with an excision of the distal clavicle and a revision decompression.  (Id. at 307-08, 320-21.)  Ten days later, Plaintiff was doing well.  (Id. at 308.)  She was to restart her physical therapy program, going once a week for four weeks, and then return to Dr. Hulsey.  (Id.)

Plaintiff next saw Dr. Thanawalla in June.  (Id. at 252, 274.)  She had a cough and sinus infection.  (Id. at 252.)  Blood tests indicated that her glucose was high, but not as high as before.  (Id. at 274.)

Three weeks later, on June 23, Plaintiff again saw Dr. Hulsey, reporting that her right shoulder had been "a little bit more painful," but her left shoulder "ha[d] made excellent progress." (Id. at 308-09.) The range of motion in her left shoulder was normal. (Id. at 308.) The range of motion in her right shoulder was full, but with some mild tenderness. (Id.) Plaintiff was to continue doing her exercise program on her left shoulder and increase her activities as tolerated. (Id. at 309.) She was to return in three months. (Id.)

Two assessments of Plaintiff were also before the ALJ.

Plaintiff underwent a consultative examination on March 23, 2005, by Bobby Enkvetchakul, M.D., M.P.H. (Id. at 203-05.) She complained of low back, neck, and hip pain. (Id. at 203.) She reported that she had had back surgery in 1994 or 1995 and was doing well until she was in a car accident in 2002. (Id.) Since that time, she has had a lot of pain. (Id.) She had been seeing Dr. Brockman but had recently decided to change treating physicians. (Id.) She had been taking pain medications, but had decided to stop because of "addiction issues" and was now taking only over-the-counter medications. (Id.) Plaintiff further reported that she had last worked in 2000. (Id.) Her last job was at McDonald's and was preceded by one at Wal-Mart for five years and an earlier job at a nursing home for eight or nine years. (Id.) "She did not express any desire or plans to return to gainful employment." (Id.)

On examination, Plaintiff was in no apparent distress and had no obvious deformity. (Id.) She appeared depressed during the examination. (Id.) She was able to rise from a seated position and to get on and off the examination table without assistance. (Id.) She

walked slowly with a "shuffling type of gait" and had "multiple complaints of pain." (Id. at 204.) She could rise up on her toes and rock back on her heals, but complained of pain in her low back. (Id.) She had a very limited active range of motion in her lumbar spine and could not stand in a fully upright position, staying flexed at the waist about 10E. (Id.) She had a 30E arc of flexion forward and a 10E range of motion when side bending. (Id.) She was tender to palpation over the spine. (Id.) There was no muscle spasm. (Id.) "Waddell testing was positive for axial loading, simulated rotation, light touch, and nonanatomic distribution of her complaints."[9] (Id.) She had negative straight leg raises to 70E for radicular type complaints in either leg when seated but positive straight leg raises at 10E to 20E for severe back pain when supine.[10] (Id.) There was no swelling or erythema (redness). (Id.) She held her head "very stiffly" and flexed slightly forward. (Id.) She had a very limited active range of motion in her cervical spine, with flexion being about 40E, full extension in the upright position was limited 10E, and rotation was 10E to 20E bilaterally. (Id.) She was diffusely

---

[9]"Waddell's signs are a group of physical signs . . . in patients with low back pain." **McMurray v. Astrue**, No. 08-5044-CV-SW-REL-SSA, 2009 WL 3052204, *7 n.4 (W.D. Mo. 2009). "They are thought to be indicators or a non-organic or psychological component to pain. Historically they have been used to detect 'malingering' patients with back pain." **Id.** These signs include "[a]xial loading-eliciting pain when pressing down on the top of the patient's head"; "[p]ain on simulated rotation – rotating the shoulders and pelvis together should not be painful . . ."; "[s]uperficial tenderness – skin discomfort on light palpation"; and "[n]onanatomic tenderness – tenderness crossing multiple anatomic boundaries." **Id.** A finding of three signs is considered clinically significant. **Reinertson v. Barnhart**, 127 Fed. Appx. 285, 289 (9th Cir. 2005).

[10]"During a [straight leg raising] test a patient sits or lies on the examining table and the examiner attempts to elicit, or reproduce, physical findings to verify the patient's reports of back pain by raising the patient's legs when the knees are fully extended." **Willcox v. Liberty Life Assur. Co. of Boston**, 552 F.3d 693, 697 (8th Cir. 2009) (internal quotations omitted).

tender to palpation over her entire spine and complained of pain even to light touch. (Id.) She had a 50 out of 63 on the Beck Depression Inventory, indicating "extreme depression, or possibly an exaggeration." (Id.)

Dr. Enkvetchakul concluded as follows.

Based on the current history and physical examination, [Plaintiff] has multiple complaints of low back pain, as well as cervical pain of unexplained etiology. Current physical examination, as well as her past history and medical records is consistent with her prior herniated disc with lumber radiculopathy in the left, which was treated with a surgical procedure in 1993. However, her continuing complaints of pain in the lumbar spine and the cervical spine region were essentially over the entire spine, is not consistent with any type of physical pathology known to this examiner. She has multiple extreme complaints of pain extending from the cervical spine region down to the lumbar spine region, and on physical examination, evidence of symptom magnification. This does not mean that [Plaintiff] does not have any complaints of pain. However, it does tend to question the validity of those complaints. Again, as stated previously, she does have physical examination findings that are consistent with a possible S1 nerve root dysfunction on the left, but there are no acute findings that she has any evidence of radiculopathy that is ongoing. . . . [G]iven her multiple constant complaints of pain and nonanatomic findings on physical examination, it does not appear that she has any active pathology in either her cervical or lumbar spine.

[Plaintiff] did score very high on the Beck Depression Inventory at 50 out of 63, which is in the extreme depression range, or could possibly represent exaggeration of her complaints. . . .

As for her work capabilities, given her constant complaints of pain and nonanatomic findings on today's examination, I am unable to find any objective reason for any significant limitations. Depression does appear to be the overriding factor in her case. However, she does have a history of a prior back surgery and it would be reasonable to at least limit her heavy lifting capabilities. Therefore, I see no reason that she could not sit during a normal eight-hour workday, given the usual breaks. I see no evidence for any restriction in standing. There should be no limitations in reaching. I would limit her to a 50 lb maximum weight limit for lifting . . . . She should have no trouble with handling objects or with speaking or hearing. . . .

- 25 -

(<u>Id.</u> at 204-05.)

Dr. Enkvetchakul diagnosed Plaintiff with back pain, status post lumbar laminectomy in 1995, neck pain, and depression. (<u>Id.</u> at 204.)

Dr. Thanawalla completed a Physical Medical Source Statement in May 2006 at Plaintiff's counsel's request. (<u>Id.</u> at 329-32.) The diagnosis was a history of degenerative disc disease in the lumbar spine, complaints of chronic low back pain, and bilateral shoulder surgery in 1997 and 2000. (<u>Id.</u> at 329.) During an eight-hour work-day, Plaintiff could sit or stand for one hour each. (<u>Id.</u>) Her ability to walk was unlimited. (<u>Id.</u>) She could continuously lift ten pounds, frequently lift twenty-five pounds, and occasionally lift more than fifty pounds. (<u>Id.</u> at 330.) She could continuously carry five pounds, frequently carry ten pounds, and occasionally carry up to twenty-five pounds. (<u>Id.</u> at 330.) She did not have any manipulative, visual, communicative, or balancing limitations. (<u>Id.</u> at 330-31.) She could reach above her head between one-third and two-thirds of the time. (<u>Id.</u> at 331.) She had pain due to the degenerative disc disease which could last up to thirty minutes every day. (<u>Id.</u>) This pain was objectively indicated by muscle spasms and subjectively indicated by complaints and irritability. (<u>Id.</u>) Plaintiff did not need a cane or other assistive device, but would need to lie down or take a nap during a normal eight-hour day. (<u>Id.</u> at 332.) Because of her back pain, she would also need to take a break every two hours. (<u>Id.</u>) Her limitations had existed at this level since 1995. (<u>Id.</u>) Dr. Thanawalla noted that she had seen Plaintiff for low back/neck pain in March 2005, August 2005, and January 2006. (<u>Id.</u>)

## The ALJ's Decision

The ALJ first decided that the only period in question was that from April 15, 2005, through June 30, 2005, the date Plaintiff was last insured. (Id. at 20.) He based this decision on his finding that the earlier determination of April 14, 2005, see note 2, supra, was *res judicata* in that there was no right to administrative review of an ALJ's refusal to reopen a case.[11] (Id.)

The ALJ began his analysis of the merits of Plaintiff's DIB application for the period in question with step one of the Commissioner's five-step sequential evaluation process, see pages 31 to 34, below, and determined that Plaintiff had not been engaged in substantial gainful activity since the date in question. (Id. at 22.) At step two, he determined that she had severe impairments of degenerative disc disease, diabetes mellitus, and status post left rotator cuff repair. (Id.) She did not have a medically determinable mental impairment during the relevant period. (Id.) This absence was indicated by the lack of any psychiatric medication and of any mention by her treating physician of a problem with depression during this period. (Id.)

The ALJ found at the next step that her impairments, singly or in combination, did not meet or equal an impairment of listing-level severity. (Id. at 22-23.)

Addressing at the fourth step the question of Plaintiff's residual functional capacity (RFC), the ALJ determined that she could perform light work[12] except that she (i) had to be

---

[11]Plaintiff does not challenge this decision.

[12]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b).

able to frequently rotate positions; (ii) could occasionally climb ramps and stairs, but not ropes, ladders, or scaffolds; (iii) could occasionally balance, stoop, kneel, crouch, crawl, and reach, including overhead; (iv) should avoid concentrated exposure to industrial hazards and heights; and (v) must work in a temperature controlled environment.  (Id. at 23.)

In determining Plaintiff's RFC, the ALJ evaluated her credibility.  (Id. at 23-27.) After summarizing Plaintiff's testimony,[13] he noted that when seen in March 2005 she was in no apparent distress and had no obvious deformity and also noted the unremarkable findings of a 2001 ultrasound of her pelvis; the results of the 2002 x-rays and MRI of her lumbar spine; the fasting glucose results in May 2002 and April 2005 that were within normal limits; and her better-than-predicted results on the May 2002 pulmonary function tests.  (Id. at 24-25.)  He also noted the results of the MRIs of her left shoulder and the absence of any medical treatment for that shoulder between February 2004 and October 2006 – the period beginning "over a year prior to" her date last insured and ending at least a year after that date.[14]  (Id. at 25.)

The ALJ next summarized Dr. Enkvetchakul's findings.  (Id. at 26.)  He concluded that Dr. Thanawalla's medical source statement was entitled to little weight, noting that (a) the statement was prepared almost a year after Plaintiff's date she was last insured and (b) the

---

[13]The ALJ mistakenly described Plaintiff as having three children; she has two.

[14]The ALJ conclusion that, based on this gap, "it was reasonable to assume . . . that the shoulder was bothering her very much at the time her insured status expired" is clearly a proofreading error.  Based on the ALJ's prior recitation of Plaintiff's treatment, he meant to say her shoulder was *not* bothering her very much.

functional limitations listed in the statement were not supported by the doctor's objective studies, including a January 2006 x-ray of her right shoulder; March 2005 x-rays of her right knee, lumbar spine, and cervical spine; an August 2005 CT scan of her abdomen and pelvis; and an August 2005 ultrasound of her liver and pancreas. (Id. at 26-27.) Moreover, Dr. Thanawalla's statement about Plaintiff's lifting, carrying, reaching, stooping, and walking were consistent with her RFC. (Id. at 27.) Any limitations greater than this RFC were entitled to little weight because they were not mentioned in the treatment records, were not consistent with the objective findings, were not made for a year after her date last insured, were "reported in rather meager detail," and were prepared for compensation and not for treatment. (Id.) Dr. Thanawalla has also reported that the limitations described in his statement had existed since 1995, but Plaintiff had worked from 1995 to 1999, inclusive, and had her highest earnings in 1997. (Id.) On the other hand, the findings of Dr. Enkvetchakul, an occupational medicine specialist, were explained in great detail and were made following an examination conducted shortly before Plaintiff's insured status expired. (Id.)

The ALJ further noted that Plaintiff had testified primarily about her current symptoms and had reported that she was "getting worse and was not as bad years ago." (Id.)

At step four, the ALJ found that Plaintiff was unable to perform her past relevant work. (Id.) The ALJ next found at step five that given her age, education, work experience, and RFC, there were jobs that existed in significant numbers that she could perform. (Id. at 28.) According to the VE's testimony, these jobs, defined in the DOT, included information clerk, furniture rental economy, and surveillance system monitor. (Id.)

For the foregoing reasons, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act for the relevant period from April 15, 2005, through June 30, 2005. (Id. at 29.)

## Additional Record Before the Appeals Council

With his request to the Appeals Council for review of the ALJ's decision, counsel submitted a copy of a November 2007 letter from the United States Department of Labor's Bureau of Labor Statistics to an Oregon attorney informing him that the Bureau viewed the DOT as obsolete and no longer used it. (Id. at 13-14.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do [her] previous work, but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate

analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." <u>See</u> 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. <u>See</u> 20 C.F.R. § 404.1520(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities . . . ." Id.

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. <u>See</u> 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, she is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite her limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description

of [her] limitations.'" **Moore**, 572 F.3d at 523 (quoting <u>Lacroix</u>, 465 F.3d at 887). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir. 2001) (quoting <u>Frankl v. Shalala</u>, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." **Wagner**, 499 F.3d at 851 (citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984)). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting <u>Pearsall</u>, 274 F.3d at 1218). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work

[claimant has] done in the past." 20 C.F.R. § 404.1520(e).  The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work.  **Moore**, 572 F.3d at 523; <u>accord</u> **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  <u>See</u> <u>also</u> 20 C.F.R. § 404.1520(f). The Commissioner may meet his burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, or "[i]f [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment," **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001).  "The Medical-Vocational Guidelines are a set of rules that direct whether the claimant is or is not disabled '[w]here the findings of fact made with respect to a particular individual's vocational factors and [RFC] coincide with all of the criteria of a particular rule.'"  **King v. Astrue**, 564 F.3d 978, 981 (8th Cir. 2009) (quoting 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(a)).  "If a mental impairment affects the claimant's ability to meet job demands other than strength, the Guidelines are not directly applied but 'provide a

framework to guide [the] decision.'" **Id.** (quoting 20 C.F.R. § 404.1569(a)). Use of the

Guidelines is appropriate if "'a claimant's subjective complaints of pain are explicitly

discredited for legally sufficient reasons articulated by the ALJ[.]'" **Baker v. Barnhart**, 457

F.3d 882, 894-95 (8th Cir. 2006) (quoting <u>Naber v. Shalala</u>, 22 F.3d 186, 189-90 (8th Cir.

1994)).

If the claimant is prevented by her impairment from doing any other work, the ALJ

will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above

is conclusive upon this Court "'if it is supported by substantial evidence on the record as a

whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547

F.3d 933, 935 (8th Cir. 2008)); <u>accord</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir.

2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable

mind would find it adequate to support the conclusion.'" <u>**Wiese**</u>, 552 F.3d at 730 (quoting

<u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to

determine whether the Commissioner's decision is supported by substantial evidence,

however, the Court must consider evidence that supports the decision and evidence that fairly

detracts from that decision. **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d

1047, 1050 (8th Cir. 1999). The Court may not reverse that decision merely because

substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037,

or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if "it is

possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000). See also **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

### Discussion

Plaintiff argues that the ALJ erred by (1) failing to include a narrative discussion explaining his RFC and by assessing a RFC that is not supported by substantial evidence; (2) failing to follow 20 C.F.R. § 404.1527(d) when evaluating the opinion of her treating physician; (3) failing to resolve the conflict between the VE's testimony and the DOT before relying on the VE's testimony; and (4) relying on the VE's unsupported evidence about the number of jobs existing in the economy. When addressing these arguments, the focus is on the ten-week period between April 15, 2005, and June 30, 2005.

The ALJ's RFC.  After discussing the medical and nonmedical evidence, the ALJ determined that Plaintiff had the RFC to (i) occasionally lift no more than twenty pounds and to frequently lift no more than ten pounds; (ii) occasionally climb ramps and stairs, but not ropes, ladders, or scaffolds; and (iii) occasionally balance, stoop, kneel, crouch, crawl, and reach, including overhead.  Also, she needed to (a) be able to frequently rotate positions; (b) avoid concentrated exposure to industrial hazards and heights; and (c) work in a temperature controlled environment.  Plaintiff argues that this RFC is not supported by the required narrative discussion.

As noted by Plaintiff, the ALJ's "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts . . . and nonmedical evidence."  S.S.R. 96-8p, 1996 WL 374184, * 7 (Soc. Sec. Admin. July 2, 1996). In the instant case, the ALJ did consider and weigh the medical evidence, including the opinions of Drs. Enkvetchakul and Thanawalla as to various aspects of Plaintiff's RFC.  His conclusions as to her RFC drew from both, but blindly incorporated neither.  "ALJs bear 'the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence.'" **Wildman v. Astrue**, 596 F.3d 959, 969 (8th Cir. 2010).  The ALJ did so.  That he preceded his RFC conclusions with a narrative discussion of all the relevant evidence rather than setting out the supporting evidence directly after each conclusion does not negate the inclusion of the required discussion.

The Court notes that an integral part of the ALJ's determination of a claimant's RFC is an evaluation of her credibility.  See **Wagner**, 499 F.3d at 851, **Dukes**, 436 F.3d at 928. Plaintiff insists that she is not challenging the ALJ's assessment of her credibility.  "However, [Plaintiff] fails to recognize that the ALJ's determination regarding her RFC was influenced by his determination that her allegations were not credible."  **Wildman**, 596 F.3d at 969.

Dr. Thanawalla.  Plaintiff next argues that the ALJ failed to follow 20 C.F.R. § 404.1529(d) when evaluating the opinion of her treating physician, Dr. Thanawalla.

Section 404.1529(d) requires that an ALJ consider six factors when weighing medical opinions.  These factors include (1) the examining relationship; (2) the treatment relationship, with more weight to generally be given to opinions from treating sources and with

consideration given to the "[l]ength of the treatment relationship and the frequency of the examination" and the "[n]ature and extent of the treatment relationship"; (3) supportability; (4) consistency; (5) specialization; and (6) "[o]ther factors," such as the extent to which the medical source is familiar with the claimant's case record.

Plaintiff first consulted Dr. Thanawalla two weeks before the period in question began. She reported low back pain since 1994 and neck pain since 2001. X-rays of her lumbar spine showed degenerative disc narrowing at L5-S1 and at L4-L5. X-rays of her cervical spine were normal. She was prescribed medication and told to apply moist heat. Plaintiff next saw Dr. Thanawalla six weeks before the period in question ended. This visit was for knee pain. When Plaintiff next saw Dr. Thanawalla, two weeks after the period in question ended, it was to request a diabetes screening. Eleven months after the period in question ended, Dr. Thanawalla completed a checklist form in Plaintiff's behalf. There were two causes listed for the limitations marked on that form – back pain and bilateral shoulder surgery. The ALJ's conclusions as to Plaintiff's RFC for reaching above her head are consistent with those of Dr. Thanawalla. The ALJ did not find, however, as did Dr. Thanawalla that Plaintiff needed to take a break every two hours or lie down and take a nap during a work-day. Dr. Thanawalla attributed these requirements to Plaintiff's back pain, noting that she had seen Plaintiff for her back pain in March 2005, August 2005, and January 2006. At that first visit, Plaintiff reported having back pain since 1994 and neck pain since 2001. Dr. Thanawalla reported that the limitations described and which "existed at the assessed severity" had done so since 1994. Nothing in the record supports this conclusion. Although an ALJ may not substitute his

opinion for that of a physician, the ALJ may "'reject the opinion of any medical expert where it is inconsistent with the medical record as a whole.'" **Finch**, 547 F.3d at 938 (quoting Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002)); accord **Halverson v. Astrue**, 600 F.3d 922, 929-30 (8th Cir. 2010). See also **Davidson v. Astrue**, 501 F.3d 987, 991 (8th Cir. 2007) (an ALJ can discount opinion evidence based on "an appropriate finding of inconsistency with other evidence").

Dr. Enkvetchakul had extensively examined Plaintiff three weeks before the period in question had begun and one week before Plaintiff's first visit to Dr. Thanawalla. Plaintiff complained to Dr. Enkvetchakul of low back, neck, and hip pain, but also reported that she had been doing well until 2002. She had been taking pain medication but had stopped for reasons unrelated to the medication's efficacy. Dr. Enkvetchakul found her complaints to be inconsistent with any physical pathology known to him and to be indicative of symptom magnification.

"'When one-time consultants dispute a treating physician's opinion, the ALJ must resolve the conflict between those opinions.'" **Wildman**, 596 F.3d at 969 n.4 (quoting Wagner, 499 F.3d at 849). Both Drs. Thanawalla and Enkvetchakul saw Plaintiff shortly before the period in question began. Dr. Thanawalla also saw her shortly after that period ended. Dr. Enkvetchakul's examination, however, was more extensive. Moreover, his findings are not inconsistent with the objective findings of Dr. Thanawalla, but are only inconsistent with the opinions of Dr. Thanawalla that are based on Plaintiff's reports, reports

which differed from those given Dr. Enkvetchakul.  "'[A]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" **Id.** at 964 (quoting Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005)) (internal quotation omitted).

The ALJ's RFC was, with the exception of the reaching limitation, more liberal than that of Dr. Thanawalla and more conservative than that of Dr. Enkvetchakul, but was supported by substantial evidence.

The VE and DOT.  Plaintiff describes two conflicts about the cited potential jobs that she argues should have been resolved by the ALJ.  The first is the language level required by the DOT for the jobs cited by the VE as ones she could perform and her actual language skills.  The second is the VE's citation to jobs described in the DOT which will not accommodate her need to rotate positions.

A language level three[15] is required for a call-operator, DOT 237.367-014, 1991 WL 672186 (G.P.O. 1991); an information clerk, 237.367-018, 1991 WL 672187; and a surveillance system monitor, 379.367-010, 1991 WL 673244.  A language level three is defined, in relevant part, as reading "a variety of novels, magazines, atlases, and encyclopedias." Id.  A language level two is required for a furniture-rental consultant, DOT 295.357-018, 1991 WL 672589, and is defined as a "[p]assive vocabulary of 5,000 - 6,000

_____

[15]"There are six possible development levels listed in the DOT for language . . . ." **Closson v. Astrue**, 2008 WL 504013, * 7 (N.D. Ia. 2008).  The lowest is level one. **Id.**

words" and reading "adventure stores and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation," id. Plaintiff argues that her testimony that she was in special education classes after the third grade and her report that she read and wrote at a second grade level establishes that she is unqualified for these positions. The Commissioner counters that the ALJ properly did not find a reading limitation and that the jobs Plaintiff has performed, i.e., a cashier, nurse's aide, and meat cutter, require a two or three language level.[16]

Plaintiff did not allege any learning disability or reading problems when applying for DIB.[17] She did not allege that any language problems interfered with her previous jobs performances or contributed in any way to the end of those jobs. She did testify that she was in special education between the third and tenth grades, inclusive, but did not elaborate why. She graduated from high school after being in normal classes, albeit with some help, in the eleventh and twelfth grades. Given an opportunity in a prior proceeding to submit her school records, she failed to do so. Having been so long silent on the question of her reading

_____

[16]The Commissioner also notes that Plaintiff did not allege a reading problem in earlier applications and did not submit any school records when the ALJ in a previous proceeding specifically held the record open for her to do so.

[17]Plaintiff does note that she reported that she read and wrote "about second grade books" and that she has help reading instructions. The first reference was made in the same form in which she reported that she had attended vocational school after graduating from high school. The second reference was made in a report in which she also disclosed that she drove a car. Taken in context, the two references do not sufficiently put the ALJ on notice of a claim of reading difficulties that would preclude Plaintiff from performing the jobs cited by the VE given (i) Plaintiff's failure to list such difficulties in her DIB applications and (ii) her hearing testimony referring only to special education classes and not to any specific problems.

abilities, she now challenges the VE's reliance on DOT job classifications requiring the next-to-lowest language level or the middle-of-the-road language level. This reliance is understandable given the absence of any finding by the ALJ of a reading or other language difficulty of Plaintiff's and, consequently, of any reference to such difficulty in the hypothetical questions he posed to the VE.

"A hypothetical question is properly formulated if it sets forth impairments 'supported by substantial evidence in the record and accepted as true by the ALJ.'" **Guilliams v. Barnhart**, 393 F.3d 798, 804 (8th Cir. 2005) (quoting Davis v. Apfel, 239 F.3d 962, 966 (8th Cir. 2001)); accord **Goff**, 421 F.3d at 794; **Haggard v. Apfel**, 175 F.3d 591, 595 (8th Cir. 1999). Given the lack of any assertion by Plaintiff that she had a reading, intellectual, or language impairment, the ALJ did not err in not including such in his hypothetical questions to the VE. Nor did the VE err in relying on DOT classifications that included language requirements when there was no evidence that Plaintiff did not satisfy such requirements.[18]

Plaintiff also argues that the ALJ erred by relying on the VE's testimony without requiring the VE to explain why he thought Plaintiff could perform work at the light and sedentary levels when she needed to rotate positions. In **Davis v. Apfel**, 239 F.3d 962 (8th Cir. 2001), the Eighth Circuit Court of Appeals held that an ALJ did not err by relying on a VE's testimony that certain jobs would allow the claimant to rotate positions. **Id.** at 966. Similarly, in the instant case, the VE testified that a hypothetical individual could perform

---

[18]Clearly, an ability to read magazines, language level three, or comic books, is not inconsistent with special education classes until the tenth grade and graduation from high school.

certain jobs if that individual needed "to rotate positions frequently." (R. at 55.) The ALJ need not require an explanation to an adequate response.

Significant Numbers. In her final argument, Plaintiff contends that the ALJ further erred by relying on the VE's unsubstantiated testimony about the number of the cited jobs that exist in the national and state economies. In support of her position, Plaintiff cites the letter from the Bureau of Labor Statistics that the DOT is regarded as obsolete.

At the fifth step of the evaluation process, the Commissioner is required to "demonstrate[] that other work exists in significant numbers in the national economy that [the claimant] can do, given [the claimant's] [RFC] and other vocational factors." 20 C.F.R. § 404.1560(c)(2); accord **Hall v. Chater**, 109 F.3d 1255, 1259 (8th Cir. 1997). The Commissioner may satisfy this burden by taking administrative notice of job information from, among other government publications, the DOT or from a VE. 20 C.F.R. § 404.1566(d)(1) and (e). The ALJ elicited information from the VE on the number of jobs in the national economy for each of the positions cited by the VE. The lowest number was the approximately 300 surveillance system monitor positions in the state economy. The Eighth Circuit has affirmed an ALJ when the number at issue was 122. **Id.**

### Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision. "As long as substantial evidence in the record supports the Commissioner's decision, [this Court] may not reverse it [if] substantial evidence exists in the record that would have

supported a contrary outcome or [if this Court] would have decided the case differently."

**Krogmeier v. Barnhart**, 294 F.3d 1019, 1022 (8th Cir. 2002) (internal quotations omitted)

accord **Gowell v. Apfel**, 242 F.3d 793, 796 (8th Cir. 2001).  Accordingly,

      **IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

      The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

                                        /s/ Thomas C. Mummert, III
                                        THOMAS C. MUMMERT, III
                                        UNITED STATES MAGISTRATE JUDGE

Dated this  22nd  day of July, 2010.